UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| DONNELL RICHARD REID II, an individual,<br><br>            Plaintiff,<br><br>  v.<br><br>DARREN PHILLIPS, an individual; M. SOUDER, in his individual and official capacity; THE LAS VEGAS METROPOLITAN POLICE DEPARTMENT; DOE DEFENDANTS XI through XX, in their individual and official capacity,<br><br>            Defendants. | Case No. 2:19-cv-02035-KJD-BNW<br><br>**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

  Before the Court is Defendants' Motion for Summary Judgment (ECF #37). Plaintiff responded in opposition (ECF #40) and Defendants replied (ECF #42).

  I.  <u>Factual and Procedural Background</u>

  On September 14, 2015, Plaintiff Donnell Richard Reid II ("Reid") was involved in a shooting at his home. (ECF #37, at 9–10). Defendant Las Vegas Metropolitan Police Department ("Metro") received a call from Robert Poggio ("Poggio"), one of Reid's roommates, indicating that a third roommate, Darren Phillips ("Phillips") had been shot. <u>Id.</u> at 10. Poggio indicated to Metro that Reid had shot Phillips. <u>Id.</u> Reid also called Metro to report the shooting, indicating it happened in self-defense. <u>Id.</u> Two Metro officers arrived on the scene to find Phillips with gunshot wounds to his face, arm, and torso. <u>Id.</u> They rendered first aid and Phillips was transported to the hospital. <u>Id.</u> The officers took Reid into custody based on witness reports and Reid's own admission that he shot Phillips. <u>Id.</u> Defendant M. Souder ("Souder"), a Metro detective, then arrived on the scene where he was briefed on the situation before initiating his investigation. <u>Id.</u>

Souder questioned Phillips at the hospital after the shooting. Id. Phillips indicated that he had moved into Reid's home in May 2015 and that he and other roommates disagreed with Reid's use of video cameras in the home. Id. At one time, Phillips turned the cameras up to prevent them from recording the tenants' actions. Id. at 11. Phillips told Souder that Reid confronted him about the cameras and told him that if he ever moved them again, Reid would kill him. Id. Poggio also stated that Phillips told him that Reid threatened to kill Phillips "a week or two" before the shooting. (ECF #37-4, at 11–12). Phillips said this was not the first time Reid had an encounter with one of the tenants. Reid attempted to evict Olga Katona ("Katona"). (ECF #37, at 11). When Katona contested the eviction and tried serving Reid with paperwork, Reid allegedly slammed Katona into the wall. Id. An interview with Poggio corroborated Phillips' testimony about Katona being slammed into the wall. Id. at 12. Reid stated that he never pushed Katona. Id. at 14. According to him, Katona tried attaching her appeal of eviction papers to Reid's door. Id. To do so, she entered Reid's room about three feet. Id. Reid closed the door on her, causing her to be pushed into a nearby wall. Id.

Phillips told Souder that shortly thereafter, Reid worked to get Phillips evicted and fired from his job. Id. at 11. According to Phillips, the shooting occurred after he confronted Reid about his attempts to get Phillips fired. Id. Phillips came home from work around 7:00 a.m. and wanted to speak with Reid about his attempts to get Phillips fired and his actions involving Katona. Id. at 11–12. They spoke in the office and Reid pulled a gun. Id. at 12. Phillips claims he did not threaten, touch, or assault Reid. Id. Almost immediately after drawing the weapon, Reid shot Phillips three times. Id. Phillips then ran outside to call for help. Id.

Poggio stated he heard the conversation from his room and remembers Phillips yelling, saying "You pushed Olgi [sic] why don't you try pushing me?" and "hit me, hit me, why don't you hit me?" Id. After what Poggio thought was about three minutes of this, Phillips said, "Oh what are you gonna do, shoot me Scott?" Id. Poggio heard the gunshots after Phillips made that statement a few times. Id. Reid tells the story differently. According to him, he was uneasy the night before the shooting and placed his 9 mm handgun on his desk in his office. Id. at 14. Phillips was yelling at him for his attempts to get Phillips fired. Id. Phillips then pushed Reid,

1 causing him to back into his office. Id. Reid backed farther into the office to trigger his security
2 camera's motion activation sensor. Id. Phillips followed him into the office and started tapping
3 Reid on the temple. Id. Phillips made disparaging comments about Reid, verbalized racial slurs
4 toward him, and threatened to have his "crew" come and rough him up. (ECF #40, at 5). Reid
5 backed behind his desk and grabbed his gun. (ECF #37, at 14). Phillips then pulled out a can of
6 pepper spray and sprayed it at Reid, hitting him in the face. Id. Phillips ran to his bedroom and
7 attempted to close his door, but something blocked the door from closing. Id. Reid decided he
8 should call 911 now that Phillips had gone into his bedroom, but at that moment Phillips lunged
9 at Reid. Id. Reid tried to avoid him and fell onto his back. Id. As Phillips continued to pursue
10 him, Reid fired two shots at Phillips but was unsure if either hit him. Id. at 14–15. As they
11 continued to struggle, Reid fired another shot which struck Phillips in the head. Id. at 15. Reid
12 then ran from the house and told a neighbor to call 911 and Phillips followed him outside. Id.

In addition to the statements made by witnesses, there were four shell casings found in the house. (ECF #37-1, at 5). Two were in the hallway lying in a pool of blood. Id. The other two were in the office and in direct line of sight with the pool of blood in the hallway. Id. There were two bullet impacts to the roof just east of the pool of blood in the hallway. Id. One went into an A/C vent and the other into a low hanging section of an entry way. Id. There was also a bullet hole in the wall at the middle platform portion of the stair case. Id. Crime Scene Investigation ("CSI") personnel stated that this round must have been fired by a person standing at the top of the stairs, aiming down at a person heading down the stairs. Id. That shell casing was unaccounted for and may have been moved to be near the others. Id.

Souder concluded his investigation and determined that there was probable cause to arrest Reid for attempted murder with a deadly weapon. (ECF #37, at 15). Souder based his conclusion on many factors, including (1) Phillips' statement that his relationship with Reid was poor and Reid had threatened to kill him before; (2) Poggio's statement corroborating Phillips' poor relationship with Reid; (3) Katona's statement describing the domestic violence incident with Reid; (4) Reid's choices during the incident to escalate the situation by grabbing his gun, following Phillips into his bedroom while holding a gun, failing to call 911 before things

- 3 -

escalated, and failing to leave the premises after Phillips retreated to his bedroom; (5) the fact that Reid used deadly force against an attacker who was not using deadly force; (6) the belief that Reid's surveillance footage might have been edited to delete the incident; and (7) the placement of the bullet casings and bullet holes, indicating that Reid shot at Phillips before following him to his bedroom and that Reid chased Phillips down the stairs, shooting as he gave chase. Id. at 15–16.

Reid was charged with eight felonies stemming from the shooting: 1 count of Attempt Murder with Use of a Deadly Weapon; 2 counts Battery with use of a Deadly Weapon Resulting in Substantial Bodily Harm Constituting Domestic Violence; 4 counts of Discharge of Firearm from or within a Structure or Vehicle; and 1 count of Mayhem with Use of Deadly Weapon. (ECF #40, at 5–6). After a jury trial, Reid was found not guilty on all charges on December 18, 2018. Id. at 6. On November 25, 2019, Reid filed this action against Phillips, Souder, Metro, and Doe Defendants. (ECF #1). The complaint lists seven causes of action: violation of 42 U.S.C. § 1983 Due Process, violation of 42 U.S.C. § 1983 violations of right to equal protection, municipal liability, abuse of process, malicious prosecution, negligence, and intentional infliction of emotional distress. Id. at 4–8. Reid alleges that Souder refused to listen with an objective mindset, conducted only a cursory investigation, and ignored exculpatory evidence because he was motivated by racial prejudice against Reid. (ECF #40, at 14). Reid argues that Souder's racial bias is evidenced by Souder telling Reid that he looked like former professional football player Terrell Owens, asking him questions to make him feel like "an ignorant black male," and Souder's past of working in the gang unit. (ECF #42, at 8; ECF #37, at 28). When asked in his deposition to identify the factual basis for Reid's conclusion that Souder's investigation was racially motivated, Reid pointed to the Terrell Owens comment, Souder's hypothetical questions about being in Phillips' shoes, and the fact that Souder did not address that Reid was pepper sprayed, that he was assaulted, or that Reid's shirt was torn. (ECF #37-6, at 136–37). Instead, Souder focused on figuring out how the shooting took place. Id. at 137.

II.     Legal Standard

Summary judgment may be granted if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. See FED. R. CIV. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of showing the absence of a genuine issue of material fact. See Celotex, 477 U.S. at 323. The burden then shifts to the nonmoving party to set forth specific facts demonstrating a genuine factual issue for trial. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

All justifiable inferences must be viewed in the light most favorable to the nonmoving party. See Matsushita, 475 U.S. at 587. However, the nonmoving party may not rest upon the mere allegations or denials of his or her pleadings, but he or she must produce specific facts, by affidavit or other evidentiary materials as provided by Rule 56(e), showing there is a genuine issue for trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). "Where evidence is genuinely disputed on a particular issue—such as by conflicting testimony—that 'issue is inappropriate for resolution on summary judgment.'" Zetwick v. Cnty. of Yolo, 850 F.3d 436, 441 (9th Cir. 2017) (quoting Direct Techs., LLC v. Elec. Arts, Inc., 836 F.3d 1059, 1067 (9th Cir. 2016)).

III.   Analysis

Reid alleged multiple state and federal claims in his complaint. Each of the claims will be analyzed.

A.   42 U.S.C. § 1983 Due Process

"Section 1983 'is not itself a source of substantive right,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" Albright v. Oliver, 510 U.S. 266, 271 (1994) (quoting Baker v. McCollan, 443 U.S. 137, 144 n.3 (1979)). The complaint does not explicitly identify the right that Reid alleges was violated. It states that Souder performed "a cursory investigation of the matter designed to find the Plaintiff guilty instead of performing an objective and fair investigation which deprived Plaintiff of rights guaranteed by the United States Constitution pursuant to the fourteenth amendment." (ECF #1, at 4). "The Fourteenth Amendment's Due Process Clause protects individuals from state action that either shocks the

conscience or interferes with rights implicit in the concept of ordered liberty." Martinez v. City of Oxnard, 337 F.3d 1091, 1092 (2003) (internal citations omitted) (per curiam opinion). Reid alleges that Souder knew or should have known about exculpatory evidence but ignored it in his report. He also alleges that Souder coerced him into providing false information. Reid claims he had a reasonable expectation that a fair and reasonable investigation would be conducted by Metro and Souder, but they failed to do so.

The Court finds that Reid has not shown and no jury could find that Defendants' conduct shocked the conscience or interfered with Reid's constitutional rights. "Federal law clearly establishes there is no viable legal claim under 42 U.S.C. § 1983 for a law enforcement officer's inadequate investigation of an alleged crime." Hageman v. Bates, No. CV-06-09 MDWM, 2007 WL 927584, at *7 (D. Mont. Mar. 23, 2007). The Ninth Circuit has confirmed "there is no legal cause of action against law enforcement officers for their conduct in inadequately investigating alleged criminal conduct." Id.; see also Gomez v. Whitney, 757 F.2d 1005 (9th Cir. 1985) (finding that the plaintiff's asserted due process right to have a full and fair police investigation was insufficient and that no courts have recognized inadequate investigation as sufficient to state a civil rights claim unless there was another recognized constitutional right involved). Reid had no due process right to an investigation of his liking. The investigation consisted of statements from witnesses, roommates, and Reid himself. The information gathered showed that Reid had allegedly threatened to kill Phillips prior to the shooting, was involved in a domestic violence incident weeks before, and could have left the scene or called 911 before the shooting occurred. It also showed the possibility that surveillance video of the incident had been deleted and that Reid chased Phillips down the stairs while firing his weapon, contradicting Reid's statement to police. Defendants had probable cause to make the arrest. Because Reid did not have the due process right to an investigation, his due process claim stemming from an inadequate investigation fails. The Court grants summary judgment to Defendants.

B. 42 U.S.C. § 1983 Equal Protection

Reid argues that his equal protection rights were violated when Souder showed a racial bias against him as an African-American. To succeed on this equal protection claim, Reid must

1  prove that Souder "acted in a discriminatory manner and that the discrimination was intentional."
2  Reese v. Jefferson Sch. Dist. No. 14J, 208 F.3d 736, 740 (9th Cir. 2000). Reid must "produce
3  evidence sufficient to permit a reasonable trier of fact to find by a preponderance of the evidence
4  that [the] decision . . . was racially motivated" Keyser v. Sacramento City Unified Sch. Dist., 265
5  F.3d 741, 754 (9th Cir. 2001) (quoting FDIC v. Henderson, 940 F.2d 465, 473 (9th Cir. 1991)).
6  Reid has not provided such evidence. Reid alleges Souder discriminated against him by telling
7  him that he looked like Terrell Owens and by asking him questions to make him feel "like an
8  ignorant black male." However, the questions that Reid identified were standard questions to
9  determine what happened and did not involve or consider race. Souder based his investigation on
10 the statements made by witnesses, statements made by Reid himself, and the opinion of the CSI
11 analysts. He had probable cause to make the arrest and bring charges against Reid. The fact that
12 Reid was found not guilty at his criminal trial does not mean his constitutional rights were
13 violated. Because Reid has not provided evidence of discriminatory intent, he has not created a
14 genuine issue of fact as to whether Defendants' actions violated the Equal Protection Clause.

15     Reid also brings a class-of-one equal protection claim. "The Equal Protection Clause
16 protects not only groups, but individuals who would constitute a 'class of one.'" Mazzeo v.
17 Gibbins, No. 2:08-cv-01387-RLH-PAL, 2010 WL 4384207, at *6 (D. Nev. Oct. 28, 2010)
18 (quoting Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000)). To prevail on a class-of-
19 one claim, a "plaintiff bears the burden to prove: (1) she has been intentionally treated differently
20 than others similarly situated; and (2) there is no rational basis for the difference in treatment."
21 Id. When evaluating a class-of-one claim, "a district court must distinguish between
22 discretionary and objective governmental decision-making because this doctrine was intended
23 for use in cases where the government departs from an objective standard." Id. In Mazzeo, the
24 plaintiff brought a class-of-one claim against Metro and its officers for failing to properly
25 investigate a potential crime. Id. The court found that the plaintiff could not "maintain a class-of-
26 one claim because she improperly challenge[d] discretionary government decision-making, i.e.,
27 police investigative decisions." Id. This Court agrees with that finding. A police investigation
28 involves discretionary government decision making and may not be the basis of a class-of-one

claim. As such, the Court grants summary judgment for Defendants on Reid's class-of-one claim.

### C. 42 U.S.C. § 1983 Municipal Liability

Reid argues that Souder's testimony discussing the criteria for becoming a detective demonstrates that Metro's policy and procedure were defective and the reason Souder deprived Reid of his constitutional rights. "A municipality or other local government may be liable under [§ 1983] if the governmental body itself subjects a person to a deprivation of rights or causes a person to be subjected to such deprivation." Connick v. Thompson, 563 U.S. 51, 60 (2011) (internal quotations omitted). Local governments "are responsible only for their own illegal acts . . . [t]hey are not vicariously liable under § 1983 for their employees' actions." Id. "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." Id The municipality's "failure to train its employees in a relevant respect must amount to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.'" Id. (quoting City of Canton, Ohio v. Harris, 489 U.S. 378, 395 (1989)). That is the only instance in which "such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." Deliberate indifference "is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." Board of Cnty. Com'rs of Bryan Cnty., Ok. v. Brown, 520 U.S. 397, 410 (1997). "Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." Connick, 563 U.S. at 62.

Reid has not shown adherence to an approach that Metro should have known would cause its officers to violate citizens' constitutional rights or that Metro disregarded a known or obvious consequence of its actions. He cannot show that Metro was on notice that its training of detectives was insufficient enough to subject it to municipal liability. Additionally, Reid has not shown what the training to become a detective entails. He relies on portions of the testimony of one retired detective for his claim that Metro failed to train its detectives properly. When read as a whole, Souder's testimony actually rebuts Reid's allegation. Even if the Court had found that

Reid's constitutional rights were violated, which it has not, Reid's claim for municipal liability would fail because he failed to show that Metro's training policy was inadequate or that the municipality was on notice of its resulting violations of citizens' constitutional rights. Therefore, the Court grants summary judgment to Defendants.

### D. Abuse of Process

An abuse of process claim requires "(1) an ulterior purpose by the [party abusing the process] other than resolving a legal dispute, and (2) a willful act in the use of the legal process not proper in the regular conduct of the proceedings." LaMantia v. Redisi, 38 P.3d 877, 880 (Nev. 2002). The plaintiff "must provide facts, rather than conjecture, showing that the party intended to use the legal process to further an ulterior purpose." Land Baron Inv. v. Bonnie Springs Family LP, 356 P.3d 511, 519 (Nev. 2015). "The utilized process must be judicial, as the tort protects the integrity of the court." Id.

Reid has failed to show that Souder had an ulterior purpose while executing his investigation. Reid alleges that Souder arrested him simply because he is African-American. Reid's only allegations of racism are that Souder said he looked like Terrell Owens, Souder previously worked in the gang unit, and Souder asked him questions that made Reid feel like "an ignorant black man." Reid has not provided anything more than conjecture that Souder's investigation was racially motivated or that he had an ulterior purpose driving his actions. Therefore, summary judgment is appropriate for Defendants.

### E. Malicious Prosecution

To prevail on a malicious prosecution claim, a plaintiff "must show that the defendants prosecuted her with malice and without probable cause, and that they did so for the purpose of denying her equal protection or another specific constitutional right." Freeman v. City of Santa Ana, 68 F.3d 1180, 1189 (9th Cir. 1995). In Freeman, the Ninth Circuit found that she could not meet her burden as she "merely list[ed] the series of citations that were issued against her and note[d] that they were dismissed." Id. Reid did the same thing here. He cannot show that Souder and Metro did not have probable cause to arrest him. Moreover, "the mere fact that a prosecution was unsuccessful does not mean it was not supported by probable cause." Id. Because Reid

cannot show that Defendants did not have probable cause to arrest him, his malicious prosecution claim fails.

### F. Negligence

"It is well established that to prevail on a negligence claim, a plaintiff must establish four elements: (1) the existence of a duty of care, (2) breach of that duty, (3) legal causation, and (4) damages." Sanchez v. Wal-Mart Stores, Inc., 221 P.3d 1276, 1280 (Nev. 2009). "Whether a defendant was negligent is generally a question of fact for the jury." Sparks v. Alpha Tau Omega Fraternity, Inc., 255 P.3d 238, 296 (Nev. 2011) (internal quotations omitted). However, the "question of whether the defendant owes the plaintiff a duty of care is a question of law" for the Court to decide. Id. Nevada law states that a "law enforcement agency is not liable for the negligent acts or omissions of its . . . officers or any other persons called to assist it, nor are the individual officers." NEV. REV. STAT. § 41.0336. That statute provides two exceptions to the rule: when an officer makes promises that a person relies on to his detriment and when the conduct of the officer affirmatively causes harm. Id. "An officer causes the harm if he 'actively creates[s] a situation which leads directly to the damaging result.'" J.D.H. v. Las Vegas Metropolitan Police Dep't., No. 2:13-cv-01300-APG-NJK, 2015 WL 3657179, at *3 (D. Nev. June 12, 2015) (quoting Coty v. Washoe Cnty., 839 P.2d 97, 99 (Nev. 1992)). In sum, "the police owe duties to the public generally, not to particular individuals." Id.

Defendants did not owe Reid a duty to perform the investigation that Reid wanted. Reid does not allege that either of the exceptions to NRS § 41.0336 apply. He merely states that his negligence claim should be submitted to a jury. However, Reid has not shown that Defendants owed him a duty that they breached. Because Reid cannot show that a duty exists, the Court grants summary judgment to Defendants.

### G. Intentional Infliction of Emotional Distress

Reid's claim for Intentional Infliction of Emotional Distress ("IIED") also fails. To prevail on an IIED claim, a plaintiff must show "(1) extreme and outrageous conduct with either the intention of, or reckless disregard for, causing emotional distress, (2) the plaintiff's having suffered severe or extreme emotional distress, and (3) actual or proximate causation." Star v.

1  Rabello, 625 P.2d 90, 92 (Nev. 1981). "[E]xtreme and outrageous conduct is that which is
2  outside all possible bounds of decency and is regarded as utterly intolerable in a civilized
3  community." Welder v. University of So. Nev., 833 F.Supp.2d 1240, 1245 (D. Nev. 2011)
4  (quoting Maduike v. Agency Rent-A-Car, 953 P.2d 24, 26 (Nev. 1998). "The Court determines
5  whether the defendant's conduct may be regarded as extreme and outrageous so as to permit
6  recovery, but, where reasonable people may differ, the jury determines whether the conduct was
7  extreme and outrageous enough to result in liability." Id. (quoting Chehade Refai v. Lazaro, 614
8  F.Supp.2d 1103, 1121 (D. Nev. 2009)).

9  Reid has failed to show that Defendants' behavior could be seen as extreme and
10 outrageous. Souder investigated the incident the way he deemed proper, not the way Reid would
11 have liked. That cannot be the basis for a IIED claim. Additionally, Reid has not shown that he
12 has suffered severe or extreme emotional distress. In his opposition to Defendants' motion for
13 summary judgment, Reid states that his emotional distress comes from the shock he was in after
14 the incident and being handcuffed in the police car. He states that "the stress and strain of being
15 charged and tried for criminal conduct and being faced with going to prison is self-evident."
16 (ECF #40, at 24). However, Reid makes no attempt to show that his distress is severe or extreme.
17 There is no indication that Reid has received counseling or psychiatric help for his distress or
18 that it has impacted his life in any way. As such, Reid cannot prove the elements of his IIED
19 claim and summary judgment is proper for Defendants.

20  H.  Qualified Immunity

21  When a plaintiff brings a § 1983 claim, government officials may claim qualified
22 immunity. Qualified immunity "shields officials from civil liability so long as their conduct does
23 not violate clearly established statutory or constitutional rights of which a reasonable person
24 would have known." Mullenix v. Luna, 577 U.S. 7, 11 (2015) (internal quotations omitted). A
25 clearly established right is one that is 'sufficiently clear that every reasonable official would have
26 understood that what he is doing violates that right.'" Id. (quoting Reichle v. Howards, 566 U.S.
27 658, 664 (2021)). Qualified immunity protects "all but the plainly incompetent or those who
28 knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986). "Qualified immunity is

an affirmative defense that the government has the burden of pleading and proving." Frudden v. Pilling, 877 F.3d 821, 831 (9th Cir. 2017). The Court finds that Souder has met his burden to show that his actions did not violate a clearly established right. His actions were not sufficiently clear that every reasonable official would have understood that what he was doing was wrong. Therefore, Souder is entitled to qualified immunity.

IV.  Conclusion

Accordingly, IT IS HEREBY ORDERED that Defendants' Motion for Summary Judgment (ECF #37) is **GRANTED**.

IT IS FURTHER ORDERED that Defendants' Motion for Leave to File Excess Pages (ECF #35) is **GRANTED**.

IT IS FINALLY ORDERED that the parties' Stipulation for Extension of Time (ECF #39) is **GRANTED**.

Dated this 21st day of October, 2021.

_____
Kent J. Dawson
United States District Judge